# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Honorable Rukhsanah L. Singh |
| v. | Mag. No. 25-14055 (RLS) |
| TERRY HAUPT | **CRIMINAL COMPLAINT** |

I, Renee Repasky, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

/s/ Renee Repasky

Renee Repasky, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1(b)(2)(A)
on December 5, 2025,
in the District of New Jersey

Honorable Rukhsanah L. Singh
United States Magistrate Judge
Name and Title of Judicial Officer

Signature of Judicial Officer

**RECEIVED**

DEC -5 2025

AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

## **ATTACHMENT A**

On or about September 22, 2025, in Monmouth County, in the District of New Jersey and elsewhere, the defendant,

TERRY HAUPT,

knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year in a court in the District of New Jersey, did knowingly possess a firearm, namely, a Fostech Lite 2.0 multi-caliber semi-automatic pistol bearing serial number LITE0004403, and the firearm was in and affecting interstate commerce.

In violation of Title 18, United States Code, Section 922(g)(1).

## ATTACHMENT B

I, Renee Repasky, am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I am fully familiar with the facts set forth herein based on my conversations with other law enforcement officers, and my review of reports, documents, and other items of evidence. Where statements of others are related herein, they are related in substance and in part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

1.   On or about September 22, 2025, at approximately 2:00 p.m., local law enforcement received two telephone calls for service from two separate residents reporting the sound of gunshots in the area of Meadowbrook and Maplewood Avenues in Rumson, New Jersey. Officers responded to the area and canvassed the neighborhood but were unable to locate the source of the reported gunshots at that time.

2.   Thereafter, at approximately 3:22 p.m., Rumson police received a 9-1-1 call from the residents of 14 Meadowbrook Avenue (the "Meadowbrook Avenue Premises") and officers were dispatched to the Meadowbrook Avenue Premises to speak with the homeowners. The homeowners reported that they returned home and discovered what they believed was a bullet hole in their rear sliding glass door. Officers observed a projectile strike to the rear sliding glass door, which caused the glass to spiderweb. The homeowners then showed officers another bullet hole inside the Meadowbrook Avenue Premises, in the area near the top left corner of the front door. The homeowners explained that there was a projectile protruding from this bullet hole, but they had removed the projectile and placed it on their living room table prior to law enforcement's arrival. Law enforcement also observed several other projectile strikes on the walls and ceiling inside the Meadowbrook Avenue Premises. Based on the path of the projectile strikes observed inside the Meadowbrook Avenue Premises, law enforcement believed that the projectile likely came from the residence directly behind the Meadowbrook Avenue Premises, which was identified as 15 Maplewood Avenue (the "Maplewood Avenue Premises").

3.   Officers responded to the Maplewood Avenue Premises and located an open rear door. At around the same time, two juveniles approached the front of the Maplewood Avenue Premises and told officers that they lived at the Maplewood Avenue Premises with with their mother, A.M. The juveniles contacted A.M., who subsequently responded to the Maplewood Avenue Premises at law enforcement's request. A.M. told law enforcement that she had been at work and did not know anything about gunshots being fired from the Maplewood Avenue Premises. A short time later, at approximately 4:45 p.m., defendant TERRY HAUPT ("HAUPT") arrived at the Maplewood Avenue Premises

3

driving a white Dodge Avenger, bearing New Jersey license plate G62VFK, registered to HAUPT (the "White Dodge"). HAUPT parked on the street in front of the residence, exited the White Dodge, and identified himself as the father of two of the minor children who resided at the Maplewood Avenue Premises. HAUPT told law enforcement that he was just stopping by the residence after work to see his children and claimed that he had no knowledge of the gunfire. HAUPT remained at the Maplewood Avenue Premises for approximately seventeen minutes and primarily stood next to the White Dodge smoking cigarettes. At approximately 5:02 p.m., HAUPT re-entered the White Dodge and departed the area.

4. As crime scene detectives processed the scene and collected evidence at the Meadowbrook Avenue Premises, law enforcement canvassed the surrounding area for video surveillance footage. During the canvass, law enforcement located a surveillance camera affixed to a pole at a construction site located next to the Maplewood Avenue Premises. Law enforcement spoke with the owner of the construction company, who advised that the surveillance camera only recorded when it detected motion. The owner of the construction company reviewed the surveillance camera footage and advised law enforcement that the camera recorded a white sedan exiting the driveway of the Maplewood Avenue Premises at approximately 3:06 p.m. The owner of the construction company provided a copy of this video clip to law enforcement.

5. After completing the canvass, investigators responded to the Maplewood Avenue Premises to speak with A.M., who provided consent for law enforcement to search the backyard and driveway of the Maplewood Avenue Premises for evidence of the shooting. Law enforcement's search of the backyard and driveway yielded negative results. While at the Maplewood Avenue Premises speaking with A.M., at approximately 8:07 p.m., law enforcement heard the sound of two gunshots, which appeared to have been fired from a nearby location. Patrol officers canvassed the surrounding area to locate the source of the gunshots while investigators remained at the Maplewood Avenue Premises to continue their investigation.

6. While canvassing the area, at approximately 8:15 p.m., a patrol officer saw a white Dodge sedan, with "G62" as the first three characters of the license plate, parked and idling in the parking lot of the municipal boat ramp located approximately one-tenth of a mile from the Maplewood Avenue Premises. The patrol officer returned to his police vehicle to check the information that had been gathered during the investigation and confirmed that the white Dodge sedan he had observed parked at the municipal boat ramp was the same White Dodge that HAUPT was driving when HAUPT appeared at the Maplewood Avenue Premises several hours earlier. When officers responded back to the municipal boat ramp, however, the White Dodge was no longer there. Law enforcement inspected the parking lot area of the

municipal boat ramp and discovered a discharged .223 caliber shell casing headstamped "STV 223 REM" on the ground.

7.  A short time later, while patrol officers were searching the surrounding area for the White Dodge, HAUPT returned to the Maplewood Avenue Premises driving the White Dodge, parked in the driveway, and exited the vehicle. Law enforcement approached HAUPT and asked if he had come from the municipal boat ramp. HAUPT denied that he had been at the municipal boat ramp and claimed that he was coming from his job in Long Branch, New Jersey. As law enforcement was speaking to HAUPT, an officer approached the White Dodge, used a flashlight to illuminate the interior passenger compartment of the vehicle through the windows, and observed in plain view an assault-style firearm on the rear passenger-side floorboard of the White Dodge.

8.  After observing the firearm inside the White Dodge, law enforcement arrested HAUPT and placed him in handcuffs. Law enforcement entered the White Dodge and removed the firearm, which was identified as a Fostech Lite 2.0 multi-caliber semi-automatic pistol bearing serial number LITE0004403 (the "Firearm"). Attached to the Firearm was a 100-round drum magazine, which was loaded with approximately 72 rounds of ammunition. The White Dodge was towed to a secured law enforcement garage, where it was subsequently searched pursuant to a search warrant. During that search, law enforcement discovered on the front passenger seat a discharged .223 caliber shell casing headstamped "STV 223 REM." In addition, law enforcement located a wallet in the center console of the White Dodge; inside the wallet was a City of Long Branch Housing Authority employee identification card bearing HAUPT's name and photograph. Law enforcement also found a large red and white shopping bag in the rear passenger-side area of the White Dodge.

9.  Law enforcement later obtained video surveillance footage captured on September 22, 2025 by exterior cameras located at Kennedy Towers, a public housing facility in Long Branch, New Jersey. The surveillance footage shows HAUPT arriving in the parking lot of the public housing facility driving the White Dodge at approximately 5:53 p.m. HAUPT exited the White Dodge and walked over to a gazebo, where he greeted two unidentified males. A short time later, HAUPT returned to the White Dodge, removed a large red and white shopping bag with an object protruding from the top of the bag, and walked back to the gazebo. HAUPT then removed the Firearm with the drum magazine attached from the red and white shopping bag, pointed the Firearm in the air, and discharged approximately four rounds of ammunition.

10. The Firearm and the discharged shell casings that were found inside the White Dodge and at the municipal boat ramp parking lot were subsequently submitted to a law enforcement laboratory for analysis. The Firearm was test fired and found to be operable. The discharged shell casings

located inside the White Dodge and at the municipal boat ramp parking lot were also microscopically compared against several test standard .223 caliber shell casings that had been discharged using the Firearm at the laboratory. Based on that examination, both the discharged shell casing found inside the White Dodge and the discharged shell casing found at the municipal boat ramp parking lot were identified as having been discharged by the Firearm.

11.   The Firearm was manufactured outside the State of New Jersey and, therefore, traveled in interstate commerce prior to HAUPT's possession thereof on or about September 22, 2025.

12.   I have reviewed the relevant criminal history records for HAUPT. That review revealed that HAUPT has multiple prior felony convictions. For instance, HAUPT two prior felony convictions in the United States District Court for the District of New Jersey. On or about August 17, 2011, HAUPT was convicted of conspiracy to distribute cocaine base, in violation of 21 U.S.C. § 846, and distribution of cocaine base, in violation of 21 U.S.C. § 841, for which he received a sentence of 37 months' imprisonment. In addition, on or about October 20, 2020, HAUPT was convicted of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, for which he received a sentence of 30 months' imprisonment.